**EXHIBIT "A"**



---

**AMENDED AND RESTATED**

**"FACTOR"  FACTORING AGREEMENT**

---

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS ........................................................................................................... 2

ARTICLE 2 INTERPRETATION ................................................................................................. 7

ARTICLE 3 ADVANCES AND ASSIGNMENT OF INVOICES ............................................ 8

ARTICLE 4 INSURANCES PROCEEDS ................................................................................. 13

ARTICLE 5 EXPENSES AND TAXES ...................................................................................... 14

ARTICLE 6 CONDITIONS PRECEDENT ............................................................................... 14

ARTICLE 7 UNDERTAKINGS BY THE SELLER ................................................................. 15

ARTICLE 8 EVENTS OF DEFAULT AND REMEDIES ....................................................... 16

ARTICLE 9 LIMITATIONS OF CLAIMS AGAINST FACTOR .......................................... 18

ARTICLE 10 INDEMNITY ........................................................................................................ 19

ARTICLE 11 REPRESENTATIONS AND WARRANTIES OF THE SELLER ................... 19

ARTICLE 12 TERM .................................................................................................................... 20

ARTICLE 13 NOTICES .............................................................................................................. 20

ARTICLE 14 CERTIFICATES OF INDEBTEDNESS ........................................................... 21

ARTICLE 15 CONFIDENTIALITY .......................................................................................... 21

ARTICLE 16 ASSIGNMENT AND DELEGATION ............................................................... 21

ARTICLE 17 COSTS ................................................................................................................... 22

ARTICLE 18 APPLICABLE LAW AND JURISDICTION .................................................... 22

ARTICLE 19 INDEPENDENT ADVICE .................................................................................. 23

ARTICLE 20 NO FORCE MAJEURE ...................................................................................... 23

ARTICLE 21 GENERAL ............................................................................................................ 23

## AMENDED AND RESTATED "FACTOR" FACTORING AGREEMENT

**THIS AGREEMENT** is dated ___22 August 2022___,

**A M O N G :**

> **CHANNEL TRADE FINANCE 2 SPC**, an exempted company incorporated with limited liability and registered as a segregated portfolio company under the laws of the Cayman Islands having its registered office at the offices of Walkers Fiduciary Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands ("**SPC 2**") on behalf of and for the account of TF ARRAN2 SP("**Portfolio 1**") (SPC 2 acting in such capacity in respect of Portfolio 1, "**Factor 1**", and a "**Factor**");

> **CHANNEL TRADE FINANCE 2 SPC**, an exempted company incorporated with limited liability and registered as a segregated portfolio company under the laws of the Cayman Islands having its registered office at the offices of Walkers Fiduciary Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands ("**SPC 2**") on behalf of and for the account of TF 2.1 SP ( "**Portfolio 2**") (SPC 2 acting in such capacity in respect of Portfolio 2, "**Factor 2**", a "**Factor**", and collectively with Factor 1, the "**Factors**"));

> - and –

> **TESSPAY SERVICES, INC.**, (formerly TESSPAY INC.) a corporation incorporated under the laws of Delaware, USA, with company registration number 823194114 and having its registered address at 9160 Forum Corporate Parkway, Suite 350, Fort Myers, FL 33905 ("**TessPay Services**");

> - and –

> **TESSPAY FINANCE, INC.**, a corporation incorporated under the laws of Delaware, USA, with company registration number 842372571 and having its registered address at 9160 Forum Corporate Parkway, Suite 350, Fort Myers, FL 33905 ("**Seller**");

**WHEREAS** TessPay Services operates a platform to allow selected telecommunications companies ("**Selling Carriers**") to securely purchase minutes from telecommunications companies and to resell such minutes to other telecommunications companies (herein called "**Buying Carriers**"), such activities referred to herein as "**Wholesale Services**";

**WHEREAS** the Seller sells invoices issued by TessPay Services on behalf of Selling Carriers to Buying Carriers, such activities referred to herein as "**Factoring Services**";

**WHEREAS** TessPay Services, the Seller and Factor 1 are parties to a certain factoring agreement dated April 14, 2021 whereby Factor 1 agreed to advance funds to the Seller for the purchase of approved invoices generated on the TessPay Platform (the "**Original Factoring Agreement**");

**WHEREAS** Factor 2 wishes to advance funds to the Seller for the purchase of approved invoices generated by the TessPay Platform by acceding to the Original Factoring Agreement;

**WHEREAS** the parties hereto wish to make certain amendments to the Original Factoring Agreement and have agreed to do so by way of an amendment and restatement of the Original Factoring Agreement;

**NOW THEREFORE** in consideration of the mutual covenants herein contained and other good and valuable consideration (the receipt whereof is hereby acknowledged) the parties hereto agree with one another as follows:

## ARTICLE 1
## DEFINITIONS

### 1.1    Definitions

The following terms, when used in this Agreement or any of the agreements referred to herein have the following meanings:

(a)    "**Balance Owed**" means the difference between the amount paid by the Buying Carrier on the Invoices Due Date and the aggregate of the Daily Settlement Amounts advanced by the Factor to the Seller during the Billing Cycle to which the Invoices to the Buying Carrier pertain;

(b)    "**Billing Cycle**" means, in respect of the Buying Carrier, the number of days as constitutes a billing cycle and at the conclusion of which the Buying Carrier shall make payment of the daily Invoices rendered in the course of the billing cycle set out in the Smart Contract Carrier Services Agreement and in the Financed Smart Contract; for greater clarity a billing cycle of sixty (60) days would entail payment terms of 30/30; meaning, Invoices are issued daily during the month with thirty (30) days to pay the Invoice (e.g. Traffic for the month of July will be due September 1st);

(c)    "**Billing Cycle Factoring Fee**" means the financing fee set by the Factor, expressed as a percentage of the Gross Invoice Amounts and paid daily from the amounts owing by the Buying Carrier to the Selling Carrier. This Fee may vary depending on, inter alia, the duration of the Billing Cycle, interest rates, and risk assumed (at the sole discretion of the Factor);

(d)    "**Billing Cycle Settlement Statement**" means the report prepared by the TessPay Platform on the Invoices Due Date for and on behalf of the Selling Carrier and the Factor showing the amount due from the Buying Carrier to the Selling Carrier in respect Minutes purchased during the Billing Cycle and the aggregate Daily Settlement Amounts paid by the Factor during the Billing Cycle, the Billing Cycle Financing Fee and any remaining amounts to be advanced by the Factor to the Seller;

(e)    "**Billing Increment**" means the minimum and incremental measures of time used to calculate the duration of each call for billing purposes[1];

(f)    "**Business Day**" means a day, other than a Saturday or Sunday, on which banks in the United States and, in respect of any payment from the Buying Carrier, when banks in the Buying Carrier Country of Registration, are open for business;

(g)    "**Buying Carrier**" means a corporation that is a party to an Origination Smart Contract that has been approved for financing by the Factor and purchases Minutes from the Selling Carrier to be transmitted as Wholesale Services *via* the TessPay Switch to the Selling Carrier pursuant to a TessPay Smart Contract Carrier Services Agreement;

(h)    "**Buying Carrier Wallet**" means that certain online account maintained on behalf of the Buying Carrier on the TessPay Platform that records all deposits made by the Buying Carrier to the TessPay

---

[1] Billing Increments typically ranged anywhere from 60 seconds to 6 seconds or less. A "30/6" Billing Increment indicates a 30 second minimum with subsequent 6 second increments. For example, a 10 second call on 30/6 billing will be billed as 30 seconds; a 31 second call on 30/6 billing will be billed as 36 seconds etc.

Depository and all transfers therefrom to the Selling Carrier Wallet in respect of payment of Invoices;

(i)      "**Call Detail Record**" or "**CDR**" means a data record produced by a telephone exchange, switch or other telecommunications equipment that documents the details of a telephone call (traffic) or other telecommunications transaction (e.g., text message) that passes through that facility or device (the CDR contains various attributes of the call, such as time, duration, completion status, source number, and destination number);

(j)      "**Companies Law**" means the Companies Act (as amended from time to time) of the Cayman Islands;

(k)      "**Conditions Precedent**" means the conditions precedent set forth in Article 6;

(l)      "**Country of Registration**" means, in respect of the Buying Carrier, the Country of Registration and any relevant governmental subdivision thereof;

(m)      "**Daily Deposit Amount**" means the amount designated by the Selling Carrier;

(n)      "**Daily Settlement Amount**" means the aggregate face value of Minutes transacted in the previous twenty-four (24) hours, which amount after applying the Daily Settlement Amount Discount, will be transferred by the TessPay Platform from the Seller's Wallet to the Selling Carrier Wallet, and then immediately following, automatically to the Financed Smart Contract Wallet.

(o)      "**Daily Settlement Amount Discount**" means the discount recorded as a percentage in the Financed Carrier Smart Contract which is applied to the face value of the Minutes for purposes of determining the Daily Settlement Amount;

"**Daily Settlement Statement**" means that report prepared by the TessPay Platform for and on behalf of the Selling Carrier and the Factor showing the daily transactions pursuant to the Financed Smart Contract;

(p)      "**Effective Date**" means, the date upon which the Conditions Precedent have been fulfilled or waived;

(q)      "**Encumbrance**" means

(i)      any mortgage, charge, pledge, lien or assignment or equivalent of any thereof conferring security, hypothecation, security interest, preferential right or trust arrangement or other encumbrance securing any obligation of any person; or

(ii)      any arrangement under which money or claims to, or for the benefit of, a bank or other account may be applied, set off or made subject to a combination of accounts so as to effect discharge of any sum owed or payable to any person; or

(iii)      any other type of preferential agreement or arrangement (including any title transfer and retention arrangement), the effect of which is the creation of a security interest;

(r)      "**Estimated Daily Amount**" means the aggregate face value of the Minutes set out in Financed Smart Contract divided by the number of days in the Billing Cycle as entered in the Financed Smart Contract;

(s)      "**Event of Default**" has the meaning set forth in Article 8;

(t)      "**Factor**" and "**Factors**" have the meanings set forth in the recitals to this Agreement;

(u)      "**Factor Accounts**" means the USD and EUR denominated financial institution accounts, nominated in writing by the Factor, into which all amounts from the TessPay Depository pursuant to written instructions from the Factor shall be paid;

(v)      "**Factor Deposit Amount**" means for:

(i)      Monday to Thursdays, the Daily Deposit Amount (to cover proceeding day's traffic)

(ii)     Friday, three times the Daily Deposit Amount (to cover Saturday, Sunday, and Monday's traffic)

(iii)    US Bank Holidays, one times the Daily Deposit Amount for each US Bank Holiday;

(iv)     The Factor Deposit Amount shall be agreed between the Parties.

(v)      The Parties acknowledge that the implied cost of funds for the Factor set out in Schedule A starts at the time the Factor Deposit Amount is available to the Seller.

(w)       "**Financed Smart Contract**" means the smart contract entered into by the Selling Carrier and a Buying Carrier on the TessPay Platform that records all daily transfers made by the TessPay Platform from the Factor Wallet (via the Selling Carrier Wallet) in respect of Daily Settlement Amounts, the Rates and Minutes contained in the Financed Smart Contract, and the Billing Cycle Factoring Fee, and TessPay Services Fees, including standard terms contained in TessPay Services Smart Contract Carrier  Services Agreements among carriers;

(x)      "**Insolvency Event**" means, in respect of any person any one of the following:

(i)      that Person is or is deemed by any authority or legislation to be unable or admits inability to pay its debts as they fall due, suspends making payments on any of its debts or, by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors with a view to rescheduling any of its indebtedness;

(ii)     the value of the assets of such Person is less than its liabilities (considering contingent and prospective liabilities);

(iii)    a moratorium is declared in respect of any indebtedness of that Person;

(iv)     any corporate action, legal proceedings or other procedure or step is taken in respect of:

(A)      the suspension of payments, a moratorium of any indebtedness of that Person;

(B)      the voluntary or involuntary commencement of any proceeding under any reorganization, arrangement or readjustment of debt, dissolution, winding up, adjustment, composition, bankruptcy or liquidation law or statute of any jurisdiction, whether now or hereafter in effect;

(C)      the appointment of a trustee, liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of that Person or any of its assets; or

(D)      the enforcement of any security over any assets of that Person.

(y)      "**Invoice**" means that document prepared daily by the TessPay Platform for and on behalf of the Selling Carrier and rendered to the Buying Carrier setting out the face value of Minutes purchased by the Buying Carrier during the Billing Cycle pursuant to the Financed Smart Contract;

27026256.2 C4585.156949

(z)      "**Invoices Due Date**" means the date upon which payment under any Invoice is due by the Buying Carrier;

(aa)     "**KYC**" means Know Your Client. It is a process by which the Factor, TessPay Services and the Seller obtain information about the identity of the Buying Carrier  and the Selling Carrier. The **KYC** procedure is completed by the Buying Carrier and the Selling Carrier during the account opening process for each of the Buying Carrier and the Selling Carrier;

(bb)     "**Material Adverse Effect**" means, as determined by the Factor in its sole and absolute discretion, acting reasonably, an event, circumstance or matter or combination of events, circumstances or matters including, for the avoidance of doubt, an occurrence of a political, fiscal or macro-economic nature in or concerning the United Kingdom, the United States of America or any Country of Registration of the Buying Carrier which is likely to adversely affect the creditworthiness of the Selling Carrier or a Buying Carrier or, which has or will have or would be likely to have a material adverse effect on:

     (i)     the ability of either Party to comply with its obligations under this Agreement;

     (ii)     the ability of the Buying Carrier to comply with its obligations under the Invoices or Smart Contract Carrier Services Agreement;

     (iii)     the ability of the Factor to obtain insurance cover over any Invoices or the right to receive any amounts pursuant thereto of the Buying Carrier;

     (iv)     the business, operations, property, condition (financial or otherwise) or prospects of the Selling Carrier or the Buying Carrier, and includes any substantial restructuring, disposal of material assets or arrangement; and/or

     (v)     the legality and/or validity and/or enforceability of this Agreement and/or the rights and/or remedies of the Factor thereunder;

(cc)     "**Maximum Billing Cycle Credit**" means, in respect of the Buying Carrier, the maximum aggregate Daily Settlement Amounts which the Factor will advance in each Billing Cycle, as set out and recorded in the Financed Smart Contract;

(dd)     "**Maximum Daily Credit**" means, in respect of the Buying Carrier, the maximum Daily Settlement Amount which the Factor will advance for any single day in a Billing Cycle, as set out and recorded in the Financed Smart Contract;

(ee)     "**Minute**" means a CDR of sixty (60) seconds duration, after applying the Billing Increment agreed in the Financed Smart Contract, and Minutes mean a multiple thereof;

(ff)     "**Parties**" means the Factors, TessPay Services and the Seller, and Party means, as required, any one of them;

(gg)     "**Person**" means and includes an individual, partnership, corporation (including a business trust), joint stock company, a limited liability company, an unincorporated association, a joint venture or any other entity or governmental authority;

(hh)     "**Portfolio**" means either Portfolio 1 or Portfolio 2 as applicable;

(ii)     "**Rates**" means the rates set out in the Financed Smart Contract and any amendments thereto processed on the TessPay Platform;

(jj)    "**Security Assignment**" means the assignment, pledge and security agreement concluded between the Seller and the Factor, as set out in Article 3 of this Agreement, pursuant to which the Seller assigns, pledges and grants a security interest to the Factor, *inter alia*, all of its rights, title and interest in and to all Invoices rendered or to be rendered and the right to render such Invoices in respect of Wholesale Services routed through the TessPay Switch, including without limitation, the Invoices in respect of the Billing Cycle;

(kk)    "**Segregated Portfolio Assets**" means the assets of a Segregated Portfolio Company that are held within or on behalf of or otherwise attributable to a segregated portfolio of such Segregated Portfolio Company;

(ll)    "**Segregated Portfolio Company**" means an exempted company incorporated and registered as a segregated portfolio company under the laws of the Cayman Islands;

(mm)    "**Seller Minimum Wallet Balance**" means an amount equal to the Factor Deposit Amount**;**

(nn)    "**Seller Wallet**" means the online account maintained on behalf of the Seller on the TessPay Platform that records all payments made by the Seller to the TessPay Depository, all payments made by the Buying Carrier in respect of Invoices (first paid by the Buying Carrier to the Selling Carrier Wallet, and automatically transferred to the Seller Wallet by the TessPay Platform), all payments made from the TessPay Depository to the Seller, and all transfers of Factor funds to and from the Financed Smart Contract Wallet;

(oo)     "**Selling Carrier**" means a corporation which is a party to an Origination Smart Contract that has been approved for financing by the Factor and purchases Minutes from a 3rd party Carrier to be transmitted as Wholesale Services *via* the TessPay Switch to the Buying Carrier pursuant to a TessPay Services Smart Contract Carrier Services Agreement, or any other corporation approved by the Factor (or Channel Capital Advisors LLP acting in its capacity as Programme Manager pursuant to the Programme Management Agreement dated 3 October 2019) at its sole discretion;

(pp)    "**Selling Carrier Routes**" means those telephone call traffic routes offered by the Selling Carrier to a specific destination as accepted by the Buying Carrier pursuant to the Financed Smart Contract;

(qq)     "**Selling Carrier Wallet**" means the online account maintained on behalf of the Selling Carrier on the TessPay Platform that records all payments made by the Selling Carrier to the TessPay Depository, all payments made from the TessPay Depository to the Selling Carrier and all transfers of Selling Carrier funds pursuant to a Financed Smart Contract and all payments of service fees from the Selling Carrier to TessPay Services in respect of its use of the TessPay Platform;

(rr)     "**Signature Date**" means the date of last signature of this Agreement;

(ss)    "**Smart Contract Carrier Services Agreement**" means that certain Smart Contract Carrier Services Agreement concluded between the Selling Carrier and the Buying Carrier in respect of Minutes to be sold by the Selling Carrier to the Buying Carrier, including Rates agreed and any amendments thereto set out in the Financed Smart Contract, the terms of which may be set forth in the Financed Smart Contract;

(tt)    "**Terminal Date**" means, twelve (12) months after the Effective Date or such later date as the Parties may agree in writing;

(uu)    "**TessPay Depository**" means that financial institution designated by TessPay Services to receive funds from the Selling Carrier, the Seller, and the Buying Carrier and to disburse funds to the Selling Carrier, the Seller and the Buying Carrier in accordance with their instructions to the extent positive balances exist in their respective Wallet;

6

(vv)     "**TessPay Services**" means TessPay Services, Inc., a corporation incorporated under the laws of Delaware, USA, with company registration number 823194114 and having its registered address at 9160 Forum Corporate Parkway, Suite 350, Fort Myers, FL 33905;

(ww)     "**TessPay Platform**" means that blockchain based escrow settlement system operated by TessPay Services that supports monitoring and daily settlement of Wholesale Services from Buying Carrier to the Selling Carrier, each of which are participants in the TessPay Platform and which have executed a TessPay Platform Services Agreement or TessPay Services Tier 1 Platform Services Agreement (a "**TessPay Platform Agreement**");

(xx)     "**TessPay Switch**" means the TessPay Services digital switching equipment, which receives Wholesale Services from the Buying Carrier and directs it to the Selling Carrier;

(yy)     "**Transaction Documents**" means:

(i)     this Agreement;

(ii)     the TessPay Platform Services Agreement;

(iii)     the TessPay Smart Contract Carrier Services Agreement;

(iv)     the TessPay Finance Factoring Agreement;

(v)     any other document designated as a Transaction Document by the Seller and the Factor in writing (and, for the avoidance of doubt, shall include agreements between a Selling Carrier and a Buying Carrier that may be in place in lieu of other agreements envisaged in this Agreement, before such time as a Buying Carrier may enter into the envisaged Transaction Documents).

and "**Transaction Document**" means any one of the aforementioned documents; and

(zz)     "**UCC**" means the *Uniform Commercial Code* as in effect from time to time in the State of Delaware;

## ARTICLE 2
## INTERPRETATION

2.1     The headings to the sections of this Agreement are for reference purposes only and shall neither govern nor affect the interpretation of nor modify nor amplify the terms of this Agreement nor any clause hereof;

2.2     The Annexes to this Agreement form an integral part of this Agreement unless otherwise specified therein, and references to an Annex are intended by the Parties to refer to the relevant Annex as it is modified from time to time with the mutual consent of the Parties.

2.3     The currency symbol "**$**" shall refer to United States Dollars and the currency symbol "**€**" shall refer to Euros as the case may be;

2.4     Any reference in this Agreement to:

(a)     a "Section" shall, subject to any contrary indication, be construed as a reference to a section hereof;

(b)     "law" shall be construed as any law (including common law), or statute, constitution, decree, judgment, treaty, regulation, directive, administrative ruling, order or any other legislative measure of any government, supranational, local government, statutory or regulatory body or court;

(c)     a "month" or a "year" shall be construed as a reference to a calendar month, quarter or year.

2.5    If any provision in a definition is a substantive provision conferring rights or imposing obligations on any Party, notwithstanding that it is only in the definition clause, effect shall be given to it as if it were a substantive provision of this Agreement.

2.6    Unless the context dictates otherwise, an expression which denotes any gender includes the other; and reference to a natural Person includes an artificial Person and to the singular includes the plural, and vice versa in each case.

2.7    When any number of days is prescribed in this Agreement, same shall be reckoned exclusively of the first and inclusively of the last day except in respect of the calculation of interest, in which case the days shall be reckoned inclusively of the first and exclusively of the last day.

2.8    In the event that the day for payment of any amount due in terms of this Agreement should fall on a day which is not a Business Day, the relevant date shall be the subsequent Business Day.

2.9    Where any term is defined within the context of any particular section in this Agreement, the term so defined, unless it is clear from the clause in question that the term so defined has limited application to the relevant section, shall bear the same meaning as ascribed to it for all purposes in terms of this Agreement, notwithstanding that that term has not been defined in Article 1.

2.10    Any reference in this Agreement to an enactment is to that enactment as at the Signature Date and as amended or re-enacted from time to time.

2.11    Each of the Parties represents to each other Party hereto that it has discussed this Agreement and with its counsel. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties hereto and no presumption or burden of proof shall arise favouring or disfavouring any Party by virtue of the authorship of any provisions of this Agreement. The expiration or termination of this Agreement shall not affect such of the provisions of this Agreement as expressly provide that they will operate after any such expiration or termination or which of necessity must continue to have effect after such expiration or termination, notwithstanding that the clauses themselves do not expressly provide for this.

2.12    Save where the contrary is indicated, any reference in this Agreement to this Agreement or any other agreement or document shall be construed as a reference to this Agreement or, as the case may be, such other agreement or document as same may have been, or may from time to time be amended, varied, restated or supplemented.

2.13    A reference to "a Factor" or "the Factor" shall refer to the applicable Factor, being either Factor 1 or Factor 2.

2.14    The Portfolio with respect to Factor1 is Portfolio 1 and the Portfolio with respect to Factor 2 is Portfolio 2.

## ARTICLE 3
## ADVANCES AND SALE OF INVOICES

3.1    **Assignment and Sale of Invoices**

(a)    The Factor hereby,  with limited recourse, buys and the Seller hereby sells, transfers and assigns, all of its right, title and interest in and to those specific accounts receivable as set forth within the Financed Smart Contracts that that the Factor approves (the "**Assignments**"), together with all rights of action accrued or to accrue thereon, including, without limitation, full power to collect, sue for, compromise, assign, or in any other manner enforce collection thereof. The Seller's accounts receivable and contract rights which are presently or at any time hereafter assigned by the Seller and accepted by the Factor are collectively referred to as the "**Purchased Invoices**", with each being a "**Purchased Invoice**."

(b)      The Seller shall assign the Invoice to the Factor on the date of the issuance of the Invoice, such assignment shall continue in full, until such time as all advances made by the Factor, and Factoring Fee thereon, have been repaid in full. The Seller represents and warrants that Invoices shall relate to the sale to a Buying Carrier of the right to terminate Wholesale Services through the TessPay Switch by a Selling Carrier in accordance with the provisions of the Financed Smart Contract and the TessPay Smart Contract Carrier Services Agreement (and, for the avoidance of doubt, any agreement in place for the same between the Selling Carrier and the Buying Carrier, in the case that such carriers have not signed all of the aforementioned agreements) and that the Selling Carrier is entitled to render Invoices in respect of all such terminated Wholesale Services to the Buying Carrier.

(c)      In respect of each daily Invoice, the ownership of the debt arising thereunder and the Seller's rights to receive all amounts owing under such Invoice and all other rights arising under or in connection with such Invoice are hereby assigned transferred and conveyed, absolutely and not as security, by the Seller to the Factor and shall vest automatically and immediately in the Factor.

(d)      TessPay Services warrants that all Wholesale Services terminated in each Billing Cycle for the Buying Carrier has terminated through the TessPay Switch during any Billing Cycle.

(e)      Upon the Factor's request, the Seller shall execute and deliver to the Factor at the Seller's sole expense, in such form as the Factor may reasonably require, duly stamped (if applicable) assignments, or such other documents as the Factor may require, formally transferring to the Factor title to the debts arising under all Invoices, the rights to receive all amounts owing under such Invoices and all other rights arising under or in connection with such Invoices. The Seller shall do such other acts and things as the Factor may reasonably require carrying out the purposes and intent of this Agreement.

(f)      If, for any reason whatsoever, ownership of an Invoice and its related payments or related rights shall fail to vest in the Factor in accordance with this Article 3 or under an assignment or other document executed pursuant to this Article 3, then the Seller shall hold such Invoices and amounts received in respect of such Invoices and related rights in trust, as the sole property of the Factor, in a segregated manner and not commingled with any other assets of the Seller, any collected proceeds of Purchased Invoices received by the Seller and the Seller shall turn the same over to the Factor within one (1) business day of Seller's receipt of the same.

## 3.2    Purchase Price

(a)      The Purchase Price shall be the face value of each Purchased Invoice, less the Factoring Fee set out below, less all credits, allowances, and other sums which the Buying Carrier takes or is entitled to claim.

## 3.3    Notice of Assignment

(a)      TessPay Services shall issue all Purchased Invoices to the Buying Carrier in the name of the Selling Carrier. All Purchased Invoices shall state clearly, in language acceptable to and pre-approved by the Factor, that such invoice has been sold and assigned by the Selling Carrier to the Seller and by the Seller to the Factor. This language shall be:

> *"We hereby inform you that this invoice (and related rights) have been assigned, in whole or in part, to TessPay Finance Inc, and then subsequently to Channel Trade Finance 2 SPC, on behalf of and for the account of [TF 2.1 SP/TF Arran 2 SP] in relation to our funding arrangements. Please make payment for the full amount of this invoice to the banking instructions mentioned [above/below] without set-off, netting, combination of accounts or counterclaim on or before the due date. Your acceptance of the foregoing will be specifically relied on by Channel Trade Finance 2 SPC, on behalf of and for the account*

*of [TF 2.1 SP/TF Arran 2 SP] in entering into funding arrangements, accordingly if you disagree with any provision of the foregoing please advise TessPay Finance Inc., immediately upon receipt of this invoice.  Your failure to dispute this provision will be taken as your acceptance of its specific terms."*

Further TessPay Services will mark the invoice payment details as follows:

(i)     If the Buying Carrier has signed the TessPay Platform Services Agreement and the TessPay Services Smart Contract Carrier Services Agreement, such notice of assignment shall direct the account debtor to make payment thereon only to TessPay's Finance Depository bank account ("**TessPay Depository**").

(ii)    If the Buying Carrier is a Tier 1 Carrier who has not signed the TessPay Platform Services Agreement, or the TessPay Services Smart Contract Carrier Services Agreement, such notice of assignment shall direct the account debtor to make payment thereon only to a bank account created by the Seller in the Selling Carrier's name, or to another account designated by the Seller and agreed writing to the Selling Carrier ("**Selling Carrier Designated Depository Account**").  Such invoice payment details shall be agreed in advance, in writing, by the Factor.

3.4     **Factoring Fee**

(a)     In consideration of the Factor's provision of billing, collection, ledgering and sales administration services to the Seller with respect to the Purchased Invoices, and the Factor's acceptance of the Credit Risk thereon from the date of the Factor's purchase thereof, the Factor's purchase shall be at a discount.

(b)     Discount rates (Factoring Fees) are set out in Schedule A.  These Factoring Fees may be amended from time to time with the advance written agreement of the Factor and the Seller and variable based on the payment terms extended to the Buying Carrier, and the Credit Rating assigned to the carrier by well-known credit rating agencies or as applied by the Factor. The Factoring Fee applied to each invoice will be set out explicitly in the Factor's approval of the Financed Smart Contract, which shall be made at the sole discretion of the Factor.

3.5     **Reserve**

(a)     The Factor will hold in reserve the difference between the Purchase Price and the Advance in an unallocated bookkeeping reserve (the "**Reserve**"). Provided there are no outstanding chargebacks, disputes, or fees and costs due to the Factor, the Factor will pay the reserve withheld as to each account to the Seller two (2) business days following the day that such Purchased Invoice has been collected in good funds (or deemed collected, as to any Purchased Accounts not collected due solely to Credit Risk assumed by Factor hereunder).

3.6     **Limited Recourse, Obligation to Repurchase**

(a)     The Factor shall have recourse to Seller if any Purchased Invoice is not collected by the Factor in the following circumstances when due and payable.  The Factor may, in addition to any other remedies it may have in respect of the Purchased Invoices, require the Seller to repurchase any part of the Purchased Invoices not otherwise paid by the Selling Carrier in the following circumstances from the Factor at any time:

(i)     In the event of fraud by TessPay Services personnel;

(ii)    In the event of any breach by the Seller of this Agreement or a manifest error by TessPay Services;

(iii)     In the event that the factoring agreement between the Seller and the Selling Carrier is amended or altered without the consent of the Factor or any breach of that factoring agreement by the Seller;

(iv)     Set-off or purported set-off by the Selling Carrier;

(v)     Any threatened or actual attempt by the Selling Carrier to withhold payment from the Seller for reasons related to a purported or actual breach of the agreement between the Selling Carrier and the Seller.

**3.7    Settlement/Alienation**

(a)     As sole owner of the Purchased Invoices the Factor shall have the right to settle any dispute with respect to any Purchased Invoice and to sell or pledge the Factor's interest in the Purchased Invoices, without the consent of the Seller. Without limitation thereof, the Seller shall advise the Factor of any disputes arising with respect to any Purchased Invoice as soon as possible`.  On the written request of the Factor, the Seller and the Selling Carrier will take all reasonable steps to resolve any dispute with the Buying Carrier, to the benefit of the Factor.

**3.8    Factor Invoice Liability Limitation**

(a)     The Seller hereby acknowledges and agrees that unless otherwise agreed by the Factor and the Seller in writing, the Factor shall in no way be held liable to the Seller, the Selling Carrier or the Buying Carrier or any other person for any amount payable in circumstances where:

(i)     the Selling Carrier transmits Wholesale Services from the Buying Carrier having a cost in excess of the Buying Carrier's Maximum Billing Cycle Credit in any Billing Cycle at any time or after the cancellation by the Factor of this Agreement; or

(ii)     for any Wholesale Services pertaining to the Selling Carrier, which may be fraudulent, or transmitted without permission through the TessPay Switch, whether or not such Wholesale Services emanated from the Buying Carrier or otherwise; and the Selling Carrier hereby indemnifies the Factor against any such liability; or

(iii)     for any other matter not specifically provided for herein, or as consented to by the Factor in writing.

**3.9    TessPay Platform Settlement Statements**

(a)     The TessPay Platform shall prepare and deliver the Billing Cycle Settlement Statement to the Seller, the Selling Carrier and the Factor on the Invoices Due Date.  The Billing Cycle Settlement Statement shall display the Balance Owed by the Factor to the Seller.  The Factor and Seller agree that the Billing Cycle Settlement Statement shall be the definitive source of information applicable to all advances and Purchase of Invoices, in accordance with this Agreement.

(b)     Should the TessPay Platform fail to render any daily Invoice, the Factor shall be entitled, as the Seller's assignee, to issue such Invoice in the name of the Selling Carrier.

**3.10    Seller Advances**

(a)     Upon the Factor's receipt and acceptance of each assignment of Purchased Invoices, the Factor hereby agrees, subject to compliance by the Seller with its obligations under this Agreement, to permit the Seller to make daily advances in an amount defined within the approval of the Financed

Smart Contract (as agreed in advance, in writing by the Factor), as a partial prepayment of such Purchase Price and not as a loan (the "**Down Payment**", variously, the "**Advance**"), to the Selling Carrier Wallet, the proceeds of which shall be used in accordance with the Financed Smart Contract, as set forth below, and the Seller agrees to sell Invoices purchased by the Factor to the Factor free and clear of any Encumbrances, as set forth below, with daily effect for each Purchased Invoice during the Billing Cycle.

(b)    Notwithstanding the foregoing, the Factor shall not, unless otherwise agreed with the Seller in writing, be obliged to approve the Seller to make daily advances in respect of Purchased Invoices for the Buying Carrier of an amount in excess of the Maximum Daily Credit for any single day in a Billing Cycle, nor daily advances in aggregate an amount in excess of the Maximum Billing Cycle Credit in any Billing Cycle.

### 3.11    Factor Advances/Smart Contract Prepayment

(a)    All Origination Smart Contracts on the TessPay Platform must be prepaid. Accordingly, the Seller will be required make prepayments for approved Origination Smart Contracts. The Seller shall make these prepayments by transferring funds to TessPay Services' Depository account, for further credit to its online account wallet (the "**Seller's Wallet**"). Funds will be transferred from the Seller's Wallet into an online account wallet set up for the Platform Carrier on the TessPay Platform (the "**Platform Carrier's Wallet**") and then for immediate credit to the online account wallet prepared for a particular Smart Contract (the "**Smart Contract Wallet**"), in such amount as is sufficient to satisfy the Smart Contract deposit requirements.  The deposit of the required funds into the Smart Contract Wallet is a precondition to activating such Smart Contract.

(b)    In respect of the above process, the Factor will make advances to the Seller in respect of anticipated traffic volumes. The Factor agrees to make weekly advances (or as maybe agreed between the Parties), subject to the Factoring Fee to the Seller's bank account based on the anticipated aggregate traffic volume for the following seven (7) days to purchase Invoices pursuant to the Financed Smart Contracts referenced in the preceding paragraph. Such advances shall be made on the first Business Day of the week and shall be repaid by the Seller one (1) business day following receipt of payment from the Buying Carrier on the Invoices Due Date, or as may be agreed between the Parties.

(c)    A reconciling adjustment will be applied to the following week's advance for any shortfall, or overage in relation to actual invoiced amounts in relation to the previous week's advance.

### 3.12    Purchased Invoice Payments

(a)    The Balance Owed shall be deemed to be paid by the Factor to the Seller in respect of each Invoice (or a portion thereof)  on the day on which the TessPay Depository or the Selling Carrier Designated Depository Account receives payment of the Invoices from the Buying Carrier. Upon transfer of funds by the Buying Carrier, the TessPay Platform shall transfer such funds from the Buying Carrier Wallet to the Selling Carrier Wallet, and the TessPay Platform shall further transfer automatically from the Selling Carrier Wallet to the Seller's Wallet in an amount equal to the advances made by the Factor to the Selling Carrier during the Billing Cycle plus any unpaid Billing Cycle Factoring Fees and any other fees, costs or other amounts payable by the Selling Carrier to the Factor pursuant to the terms of this Agreement.  For the avoidance of doubt, in the event that the Buying Carrier has not entered into all of the Transaction Documents, TessPay Services and the Seller undertake to perform the operations in this clause as if the Buying Carrier had entered into such agreements.

(b)    The payment of the Balance Owed by the Factor and/or set-off by the Factor of the Balance Owed in accordance with Sub-Section 3.12(a) shall constitute full and final payment of the Balance Owed by the Factor to the Seller in respect of that Billing Cycle.

(c)     If any Invoice (or a portion thereof) which is the subject of a dispute has not been settled within fifteen (15) days of the dispute first occurring, or an Invoice (or a portion thereof) is successfully disputed by the Buying Carrier, the Factor shall be entitled to claim from the Seller an amount equal to the aggregate Daily Settlement Amounts (or any portion thereof) which were paid in accordance with the provisions of this Article 3 in respect of the Daily Settlement Statements corresponding to the disputed Invoice (or portion thereof), together with applicable Factoring Fee on the Daily Settlement Amounts calculated from the date on which the Daily Settlement Amounts were paid, until date of re-payment, based on the number of days elapsed.

(d)     Notwithstanding that the Factor may have declined to purchase any portion of any Invoice in a Billing Cycle or may have terminated this Agreement for any reason in a Billing Cycle, all Invoices in that Billing Cycle shall be collected from the Buying Carrier and shall be paid into the TessPay Depository Account of the Buying Carrier and accounted for by reference to the relevant Billing Cycle Settlement Statement

3.13     **Buying Carrier Events of Default and Remedies**

(a)     After an Event of Default that is continuing and at the written election of the Factor to the Seller, the amounts owing under the Invoices may be recovered either by the Selling Carrier in its own name (as agent for and on behalf of the Factor) or by the Seller or by the Factor itself.

(b)     In the event that the Selling Carrier is directed via the Seller to recover the amounts owing under the Invoices in its own name (as agent for an on behalf of, and with duty of care to, the Factor), it shall do so solely in accordance with and subject to the directions of the Factor, including through the agency of attorneys and/or counsel that may be nominated by the Factor. The Seller shall ensure that the Selling Carrier shall be obliged to cooperate to the fullest extent and at its own cost with the Factor and its agents, servants and professional advisers to procure recovery of the amounts owing pursuant to an Invoice (whether the recovery is in the name of the Factor or the Selling Carrier or otherwise).

(c)     Notwithstanding whether the Factor collects the amounts owing under the Invoices in its own name, or whether it directs the Selling Carrier via the Seller to do so in accordance with the provisions of this Section, the Selling Carrier shall ensure that all payments due under the Invoices shall be paid directly into the TessPay Depository Account of the Buying Carrier as set out in the Buying Carrier TessPay Services Tier 1 Platform Services Agreement or the Selling Carrier Designated Depository Account, and the Seller share ensure that the Selling Carrier shall not be entitled or authorized to procure payment from the Buying Carrier into any other account.

(d)     The Factor shall be entitled to demand from the Seller delivery all documentation enabling recovery of all amounts payable under the Invoices.  Upon receipt of such demand, the Seller shall promptly deliver to the Factor all documentation and copies of all books of account, accounting entries, invoices, delivery notes, acknowledgements of liability and other documents of any nature whatsoever evidencing and enabling recovery of the Invoices.

(e)     The Seller hereby indemnifies the Factor in regard to all reasonable costs of recovery in respect of such Invoices.

**ARTICLE 4**
**INSURANCES PROCEEDS**

4.1     If the Factor receives any amount payable pursuant to any Invoices under any insurance policy, the Factor shall apply such amounts to amounts owing by the Seller to the Factor and the Factor shall be entitled to assign its rights in respect of such Invoices to the applicable insurer and the Seller hereby consents to such assignment.

## ARTICLE 5
## EXPENSES AND TAXES

5.1    The Seller shall pay all stamp, sales, transfer and other similar Taxes or duties and any penalties or interest levied in any jurisdiction in respect of this Agreement and any other Transaction Document to which the Factor is a party, and the Seller hereby indemnifies the Factor in respect of any claims that may be made against the Factor in respect thereof, and in respect of any loss in complying with any existing or future tax law, regulation, request or requirement, of any governmental authority.

5.2    The Seller shall pay all amounts under this Agreement or pursuant to a Smart Contract, free and clear of, and without deduction or withholding for, taxes, imposts, duties, fees, assessments or other charges of whatever nature, now or hereafter imposed by any governmental authority in any jurisdiction and all liabilities with respect thereto ("**Taxes**"). If any Taxes are levied or imposed, the Seller will pay to the Factor the full amount thereof and such additional amounts as will result in the receipt by the Factor after withholding or deduction for or on account of any such Taxes, of the full amount owing under this Agreement. The Selling Carrier will furnish to the Factor, within twenty (20) days after the date upon which any such payment is due pursuant to the applicable law, certified copies of all tax receipts evidencing the payment of all Taxes so levied or imposed and such additional documentary evidence as the Factor may reasonably request pertaining thereto. The Seller will furthermore indemnify and hold harmless the Factor against and reimburse the Factor, upon demand, the amount of any Taxes so levied or imposed upon and paid by the Factor other than through deduction or withholding by the Seller from payments of principal and interest or from any other amounts payable under this Agreement.

## ARTICLE 6
## CONDITIONS PRECEDENT

6.1    This Agreement is subject to the following Conditions Precedent having been satisfied or waived by the dates specified in Section 1.1:

(a)    the Transaction Documents shall have been duly executed and shall have become unconditional other than in respect of any Conditions Precedent which require this Agreement to become unconditional, and shall be in form and substance acceptable to the Factor;

(b)    all internal approval procedures of the Factor shall be satisfied, as evidenced by the delivery by the Factor of a written notice confirming that all such internal procedures have been satisfied;

(c)    TessPay Services and the Factor shall have completed all KYC procedures in respect of (i) the Buying Carrier and (ii) the Selling Carrier, including without limitation, confirmation of corporate existence, governing and binding authority, and identity of the same;

(d)    the Factor shall have completed due diligence in respect of (i) the Buying Carrier and the Smart Contract Carrier Services Agreement and (ii) the Selling Carrier, including, without limitation, investigating the creditworthiness of the Buying Carrier and the Selling Carrier, as well as in respect of the terms and conditions of the TessPay Services Smart Contract Carrier Services Agreement, as evidenced by acceptance of the Factor thereof on the Customer Portal of the TessPay Platform;

(e)    the Factor is satisfied that all security granted pursuant to the Security Assignment is free of all Encumbrances or that any prior security interest has been subordinated to that of the Factor to the satisfaction of the Factor;

(f)    the Factor shall have received confirmation of (i) the directors and officers of the Selling Carrier, (ii) that the entry into the Transaction Documents would not cause any borrowing, security or similar limit binding on the Selling Carrier to be in default, (iii) the solvency of the Selling Carrier and (iv) the authority to enter into the Transaction Documents and attaching and certifying that the following are true, complete and up to date;

14

(g)      the Selling Carrier shall have executed the TessPay Platform Services Agreement;

(h)      the Factor shall have received such evidence as it may request, including but not limited to a UCC lien search in respect of the Selling Carrier indicating that no Encumbrances exist in respect of the Selling Carrier's interest in the TessPay Smart Contract Carrier Services Agreement; and

(i)      the Factor shall have received evidence that UCC Financing Statements have been filed with the Secretary of State in such jurisdictions as the Factor may reasonably require.

6.2      Without any derogation from Section 6.1 unless and until the Conditions Precedent are fulfilled, this Agreement (save for the provisions of Article 2, Article 9, Article 10, and Article 15, which shall remain in full force and effect) shall be of no further or force or effect and the Factor shall have no obligations hereunder.

6.3      The conditions in Section 6.1 above are for the benefit of the Factor, and in the event that the Factor performs under this Agreement without fulfilment of such conditions the Factor shall be deemed to have waived the applicable condition or conditions, though without prejudice to its rights to insist upon fulfilment thereof in writing before making any further performance under this Agreement and/or to treat such non-fulfilment, if the Seller has failed to satisfy same within two (2) Business Days of receipt of the written notice, as an Event of Default under the terms of Article 8 (*Events of Default and Remedies*).

## ARTICLE 7
## UNDERTAKINGS BY THE SELLER

7.1      The Seller undertakes, in favor of the Factor, that for so long as it is indebted to the Factor pursuant to the terms hereof, it shall:

(a)      ensure that it is able to, and will, comply with all of the terms and conditions of the TessPay Platform Services Agreement and that the TessPay Platform Services Agreement continues to remain in full force and effect for the duration of this Agreement;

(b)      ensure that it is able to, and will, comply with all delivery obligations under the TessPay Smart Contract Carrier Services Agreement  and that the Smart Contract Carrier Services Agreement continue to remain in full force and effect for the duration of this Agreement;

(c)      comply with all of its obligations under each of the Transaction Documents;

(d)      not do, or omit to do, anything with the result that the security afforded by any security assignment is subordinated to any other security;

(e)      deliver to the Factor pursuant to the Financed Smart Contract all Rates and all rate amendments in respect of the Minutes which are the subject of this Agreement, however documented;

(f)      not, without the prior written consent of the Factor, sell Minutes to the Buying Carrier at a positive margin less than would be required to pay the Factor's Financing Fee and TessPay Services's fees;

(g)      promptly inform the Factor of any occurrence of which it becomes aware which may result in a Material Adverse Effect, or of any Event of Default or any event which with the passage of time or giving of notice or both would result in an Event of Default, forthwith upon becoming aware thereof and will, from time to time, if so requested by the Factor, confirm to the Factor in writing that, save as otherwise stated in such confirmation, no such Material Adverse Effect, Event of Default or potential Event of Default has occurred and/or is continuing;

(h)      comply in all respects with all laws to which it may be subject, if failure so to comply would materially impair its ability to perform its obligations under the Agreement;

(i)      forthwith, promptly notify the Factor of the occurrence of any Event of Default or any litigation, arbitration or administrative proceedings commenced against the Seller or the Selling Carrier;

(j)      not, without the written consent of the Factor enter into or permit any Encumbrance, sale, alienation or hypothecation of any Invoices which it is entitled to render in respect of Wholesale Services sent *via* the digital switching equipment of TessPay Services as at the Effective Date;

(k)      not, from the Signature Date until (i) this Agreement lapses for non-fulfilment of the Conditions Precedent or (ii) if this Agreement becomes effective, it ceases to have effect by reason of the effluxion of time or termination by the Factor for any reason:

      (i)      enter into any arrangements with a third party in regard to the discounting of its Invoices;

      (ii)      grant any extension of time to the Buying Carrier for payment of any of the Invoices;

      (iii)      release in whole or in part the Buying Carrier from its obligations under any Invoice; and

      (iv)      grant any credits, discounts, allowances, deduction or the like with respect to any of the Invoices.

7.2      The Seller shall provide the Factor with reasonable access to all CDR's generated by the TessPay Switch applicable to the Selling Carrier, setting out, *inter alia*, the details of all Minutes terminated across the TessPay Switch, the length of such calls and the destination details and costs in respect of such calls. Such records shall be in their original form as generated by the TessPay Switch, including but not limited to, Rates, cost and other required information and shall be available daily on the TessPay Platform via the Customer Portal to which the Factor shall have direct access.

7.3      The Seller shall ensure that no Invoice financed by a Factor is subject to set-off in accordance with a TessPay Smart Contract Carrier Services Agreement (or otherwise by a Buying or Selling Carrier) and shall notify the Factor if the Selling Carrier purchases Minutes from the Buying Carrier and if so, the Factor shall be entitled decline to purchase any portion of any Invoice which is subject to set-off in accordance with the provisions of the TessPay Smart Contract Carrier Services Agreement and/or to cancel this Agreement.

7.4      After an Event and Default that is continuing, the Seller shall permit the Factor, on reasonable notice to the Seller, to inspect all of the Seller's books, records, accounts, CDR's and all such other documentation and records in the possession of the Seller, which relate to the obligations of the Seller under this Agreement.

### ARTICLE 8
### EVENTS OF DEFAULT AND REMEDIES

8.1      Each of the following shall constitute an Event of Default if such occurrence is not cured within five (5) Business Days:

(a)      if the Seller fails to pay, on the due date thereof, any amount due pursuant to this Agreement (unless such failure is due to technical error and is remedied within one (1) Business Day after the failure);

(b)      if there is a non-payment by the Buying Carrier in respect of any Invoice within fifteen (15) days of payment becoming due;

(c)      if the Buying Carrier fails to make payment more than five (5) days later than the Due Date of any Invoice on more than two occasions, whether or not such failures occurred consecutively;

(d)      if the Seller shall have furnished to the Factor materially incorrect information in any document to be rendered in terms of any Transaction Document;

(e)     if the Seller is in breach of any warranty, representation or undertaking made by the Seller to the Factor or any other provision in this Agreement or in any other Transaction Document, and fails to remedy such breach, if such breach is capable of remedy, within five (5) Business Day or such longer period as may have been agreed upon in writing by the Factor;

(f)     VOIP Traffic part of the Wholesale Services is terminated from the Buying Carrier in any Billing Cycle the Face Value Amount of which is in the aggregate less than two and a half percent (2.5%) of the aggregate amount paid to the Selling Carrier of such the Billing Cycle without the prior written consent of the Factor;

(g)     any Insolvency Event occurs in respect of the Seller;

(h)     if a final and non-appealable judgment or, in the case of a judgment which would otherwise be appealable, against which no appeal is noted within the period permitted for such appeal, or the effect of which will exceed, $10,000 (ten thousand United States Dollars) or the equivalent in any other currency, against the Seller and which remains unsatisfied for a period in excess of thirty (30) days after the date of such judgment;

(i)     if the Seller ceases or threatens to cease to carry on business;

(j)     if there is a direct or indirect change of control of the Seller, including without limitation as a result of the majority of the voting shareholding of the Seller ceasing to be under the control (direct or indirect) of the Persons who at present exercises such control and/or if the Seller is amalgamated with, purchased (directly or indirectly) by or through any corporate reconstruction becomes a member of or associated with any other company, and, after notice to the Factor, the Factor, acting reasonably and in good faith, has determined that such change of control materially and adversely affects the Factor's Interest;

(k)     if the Seller permits the Selling Carrier to amend or vary the TessPay Smart Contract Carrier Services Agreement without the Factor's prior written consent;

(l)     any assets of the Seller are attached under any order of any court and the Seller fails to bring an application to stay such execution for more than twenty-one (21) days after the attachment or having made the application fails to obtain an order on substantially the same terms as that sought;

(m)     any third-party loan, debt, guarantee or any other obligation constituting indebtedness of the Seller or the Buying Carrier, whether or not such indebtedness is owing to the Factor is, becomes due and payable prior to its specified maturity by reason of default of the Seller, as the case may be, or is not repaid when due or any creditor of the Seller, as the case may be, becomes entitled to declare any indebtedness due and payable prior to its specified maturity;

(n)     the Seller repudiates this Agreement or any other Transaction Document or does or causes to be done or fails to do any act or thing which in the opinion of the Factor evidences an intention to repudiate any Transaction Document;

(o)     a Material Adverse Effect occurs;

(p)     the occurrence or existence of an event or condition giving rise to an entitlement to accelerate repayment of all amounts under any Transaction Document and/or an entitlement to terminate any of them;

(q)     the Seller does anything, or fails to do something, which results in any policy of insurance which the Factor has secured over the Invoices to be invalidated or terminated or which entitles the underwriter of those policies to repudiate a claim for payment;

(r)      the Seller manipulates, alters or amends the CDR's, supplied by TessPay Services and/or the Seller to the Factor in accordance with the provisions of Sections 7.2 and 7.4 such that the details contained therein are not accurate or complete;

(s)      the Seller fails to notify the Factor of any dispute between the Selling Carrier and the Buying Carrier.

8.2      If an Event of Default occurs, the Factor may, without prejudice to any other remedies which they may have under this Agreement or otherwise, including, but not limited to its right to claim damages, by written notice to the Seller:

(a)      declare all amounts owing by the Seller pursuant to this Agreement to be immediately due and payable;

(b)      forthwith terminate its obligation to purchase any further Invoices in terms of this Agreement; and

(c)      terminate all of its rights and obligations under this Agreement in respect of any further Billing Cycle.

(d)      Require the Seller to repurchase that portion of the Purchased Invoice that remains unpaid at such time.

8.3      Each and every right, power and remedy herein given to the Factor shall be cumulative and shall be in addition to every other right, power and remedy of the Factor now or hereafter existing at law, in equity or by statute, and each and every right, power and remedy, whether herein given or otherwise existing, may be exercised from time to time, in whole or in part, and as often and in such order as may be deemed expedient by the Factor, and the exercise or the beginning of the exercise of any right, power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy.

8.4      No failure, delay or omission by the Factor in the exercise of any right or power or in the pursuance of any remedy accruing upon any breach or default by the Seller shall impair any such right, power or remedy or be construed to be a waiver of any such right, power or remedy or to be an acquiescence therein; nor shall the acceptance by the Factor of any security or of any payment of or on account of any of the amounts due from the Seller to the Factor and maturing after any breach or default or of any payment on account of any past breach or default be construed to be a waiver of any right with respect to any future breach or default or of any past breach or default not completely cured thereby.

8.5      In addition to the rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to any of the obligations of the Seller under this Agreement and under the Transaction Documents to which it is party, the Factor shall have rights and remedies of a secured party under the UCC.

## ARTICLE 9
## LIMITATIONS OF CLAIMS AGAINST FACTOR

9.1      The Seller will ensure that the obligations of the Selling Carrier, including the liability to pay any amount due in terms of this Agreement on due date, are in no way conditional upon the performance of any contract by the Buying Carrier or the Selling Carrier, nor shall they be affected in any way by reason of any claim which the Selling Carrier may have, or considers that it has, against the Buying Carrier, or by any reason whatsoever.

9.2      The Factor shall not be responsible to ensure the validity of the terms and conditions of or to perform any obligations under any TessPay Services Smart Contract Carrier Services Agreement.

9.3      No claims by the Seller against the Factor may be founded upon any actions of the Factor acting in accordance with this Agreement, nor shall the Factor be liable for any loss sustained by the Seller howsoever arising

from any transaction in any way connected with, arising from or financed under the terms of this Agreement or any other Transaction Document, including without limitation losses arising from claims by the Selling Carrier against the Buying Carrier, other than as a result of the gross negligence or wilful misconduct of the Factor.

9.4    The Seller hereby agrees that in no circumstances will the Factor be liable to the Seller for any loss of profits, special or consequential damages and the Seller hereby indemnifies the Factor in respect thereof.

9.5    This Article 9 shall survive the termination of this Agreement.

**ARTICLE 10**
**INDEMNITY**

10.1    The Seller hereby indemnifies the Factor, its directors, employees, servants and agents and holds them harmless from and against all and any costs, demands, claims, losses, expenses (including legal fees) and liabilities (together with any Tax thereon) of whatsoever nature and howsoever caused and arising, which may at any time be suffered by or made against the Factor by any person or which the Factor may sustain or incur arising directly or indirectly out of, or in consequence of any Event of Default and/or any breach by the Seller of any of its obligations under this Agreement. This Article 10 (*Indemnity*) shall survive the termination of this Agreement.

**ARTICLE 11**
**REPRESENTATIONS AND WARRANTIES OF THE SELLER**

11.1    The Seller represents and warrants to the Factor that:

(a)    the Seller is duly authorized to enter into this Agreement and to sue and be sued in its own name;

(b)    the Seller has the power to enter into and perform this Agreement, has taken all necessary actions to authorize the entering into of this Agreement upon the terms and conditions of this Agreement and to authorize the execution and performance of this Agreement in accordance with its terms and conditions, and in so doing will not contravene any restriction binding on it in terms of any law or of its constitutional documents;

(c)    the provisions this Agreement and each other Transaction Document, are legal and binding on and enforceable against the Seller in accordance with its terms;

(d)    the provisions of this Agreement and each other Transaction Document are not in conflict with, and will not constitute a breach of the provisions of any other agreement or undertaking which is binding on the Seller or of the Seller's constitutional documents;

(e)    in respect of each Invoice:

(i)    that Invoice represents a *bona fide* sale and delivery of Wholesale Services onto the Selling Carrier Routes in the ordinary course of its business;

(ii)    that Invoice represents Wholesale Services which has been terminated on behalf of and accepted by the Buying Carrier and shall be free and clear of any offset, deduction, counter claim, lien, Encumbrance or any other claim or dispute;

(iii)    the Seller has right and title to that Invoice and has the legal right to sell and assign such Invoice to the Factor free and clear of any Encumbrance; and

(iv)    that Invoice is genuine and enforceable;

19

(f)     no litigation, arbitration or administrative proceedings are at present current or pending or, to the knowledge of the Seller, threatened against the Seller;

(g)     the Seller will promptly renew from time to time all consents, licenses, approvals and authorizations as may be required under any applicable law or regulation in the United States of America or applicable governmental sub-division thereof (or any jurisdiction applicable to the business and operations of the Seller), to enable it to perform its obligations under this Agreement, or required for the validity or enforceability of this Agreement and will comply with the terms of all governmental consents in relation to this Agreement;

(h)     the Seller is not in breach of or in default under any other agreement to which it is a party, or which is binding on it or any of its assets, or under any of its constitutive documents;

(i)     all information (as supplemented from time to time) that has been or will hereafter be made available to the Factor by the Seller or any of its representatives in connection with the transactions contemplated herein is and will at all times be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements were or are made;

(j)     there are no actions required to be taken in order to make this Agreement admissible into evidence in the courts of the State of Delaware and of the United States District Court for the District of Delaware;

(k)     save for the filing of UCC Financing Statements in the applicable states of formation of the Seller or the District of Colombia (as applicable) in respect of the Security Assignment, and the payment and filing or recording fees consequent thereto, it is not necessary under the laws of the State of Delaware or the United States of America in force at the date of this Agreement that this Agreement, the Security Assignment or any other Transaction Document be filed or recorded with any court or any governmental authority or that any stamp, registration or similar Tax be paid on or in relation thereto; and,

(l)     the Seller has paid and shall continue to pay all of its Tax obligations.

11.2    The Seller makes the representations and warranties set out in this Article 11 (*Representations and Warranties by the Seller*) on a continuous basis, to be effective from the Signature Date and deemed to be repeated on each day until the Terminal Date and acknowledges that the Factor has entered into this Agreement in reliance on such representations and warranties, each of which is material and a material representation inducing the Factor to enter into the Agreement.

**ARTICLE 12**
**TERM**

12.1    This Agreement shall be effective from the Effective Date until the Terminal Date.

**ARTICLE 13**
**NOTICES**

13.1    All notices, demands or communications intended for any Party shall be given to such Party at the following address or by way of email through the following email addresses:

TessPay Services Inc.
9160 Forum Corporate Parkway, Suite 350

27026256.2 C4585.156949

Fort Myers, FL, USA 33905
contracts@tesspay.io

Seller

TessPay Finance Inc.
9160 Forum Corporate Parkway, Suite 350
Fort Myers, FL, USA 33905
info@tespay.io

each Factor

"FACTOR"
c/o Channel Capital Advisors LLP
44 Whitfield Street, London, W1T 2RH
operations@channelcapital.co.uk
Attention: Operations Team

13.2    A notice sent by either Party to the other shall be deemed to be received on the same day if delivered by hand and otherwise on the fifth (5th) day after dispatch through the agency of a recognized international courier. A notice sent by e-mail to a Party's chosen email address shall be deemed to have been received on the date of transmission (unless the contrary is proved).

13.3    Notwithstanding anything to the contrary herein contained a written notice or communication actually received by a Party shall be an adequate written notice or communication to it notwithstanding that it was not sent to or delivered at its chosen notice address.

13.4    Either Party shall be entitled to change its address from time to time, provided that any new address selected by it shall be a physical address, not a post office box number and that no such change shall be effective until receipt of notice in writing by the other Party of such change.

## ARTICLE 14
## CERTIFICATES OF INDEBTEDNESS

14.1    A certificate signed by any officer, director or authorised representative of the Factor as to any indebtedness of the Seller to the Factor hereunder, shall be *prima facie* evidence of such indebtedness.

## ARTICLE 15
## CONFIDENTIALITY

15.1    Unless it is otherwise agreed, the Parties shall at all times during and after the continuance of this Agreement hold confidential and not disclose to any third party any confidential information, reports or documents received by them pursuant to, or in the course of the negotiations leading to, this Agreement and any calculations, conclusion or determinations thereon, nor any of the terms and conditions of this Agreement and the other Transaction Documents, except as required by law. Each Party shall, however, be permitted to disclose confidential information to its auditors, consultants or professional advisers under obligation of confidentiality.

## ARTICLE 16
## ASSIGNMENT AND DELEGATION

16.1    The Factor shall be entitled to assign and delegate all or any of its rights and obligations, in whole or in part, as well as the benefit of any security given, in terms of this Agreement to any third party.

16.2    The Seller shall not be entitled to assign, delegate or make over any of its rights or obligations in terms of this Agreement without the prior written consent of the Factor.

## ARTICLE 17
## COSTS

17.1    **Transaction Expenses**

The Seller shall promptly on demand pay to the Factor all reasonable or necessary costs and expenses (including reasonable or necessary legal fees on the attorney and own client scale) incurred by the Factor in connection with:

(a)    any filing, notification or registration legally required in connection with the Transaction Documents;

(b)    any costs associated with the enforcement of, or preservation of any rights of the Factor under, the terms of this Agreement and the Transaction Documents.

## ARTICLE 18
## APPLICABLE LAW AND JURISDICTION

18.1    This Agreement shall be governed by and construed in accordance with the laws of England and Wales without regard to principles of conflicts of laws thereof.

18.2    The Seller hereby irrevocably submits to the jurisdiction of the courts of England and Wales in any action or proceeding brought against it by the Factor under this Agreement or under any document delivered hereunder and hereby irrevocably agrees that valid service of summons or other legal process on it may be effected by serving a copy of the summons and other legal process in any such action or proceeding on the Seller by mailing or delivering to the Seller at the address indicated for notices in this Agreement. The service, as herein provided, of such summons or other legal process in any such action or proceeding shall be deemed personal service and accepted by the Seller as such and shall be legal and binding upon the Seller for all the purposes of any such action or proceeding. Final judgment (a certified or exemplified copy of which shall be conclusive evidence of the fact and of the amount of any indebtedness of the Seller to the Factor) against the Seller in any such legal action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment. The Seller shall advise the Factor promptly of any change of address for the purpose of service of process. Notwithstanding anything herein to the contrary, the Factor may bring any legal action or proceeding in any other appropriate jurisdiction.

18.3    TO THE EXTENT THAT THE SELLER HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM SUIT, JURISDICTION OF ANY COURT OR ANY LEGAL PROCESS (WHETHER THROUGH ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION, EXECUTION OF A JUDGMENT, OR FROM ANY OTHER LEGAL PROCESS OR REMEDY) WITH RESPECT TO ITSELF OR ITS PROPERTY, THE SELLER HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT.

18.4    IT IS MUTUALLY AGREED BY AND AMONG THE SELLER AND THE FACTOR THAT EACH OF THEM HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PARTY HERETO AGAINST ANY OTHER PARTY HERETO ON ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT.

27026256.2 C4585.156949

## ARTICLE 19
## INDEPENDENT ADVICE

19.1    Each of the Parties hereto acknowledges that it has been free to secure independent legal and other advice as to the nature and effect of all of the provisions of this Agreement and that it has either taken such independent legal and other advice or dispensed with the necessity of doing so. Further, each of the Parties hereto acknowledges that all the provisions of this Agreement and the restrictions herein contained are fair and reasonable in all the circumstances and are part of the overall intention of the Parties in connection with this Agreement.

19.2    Further, the Seller acknowledges and agrees that it has not relied in any way upon any information or advice given by the Factor in the preparation, negotiation and implementation of this Agreement and has taken all reasonable actions to satisfy itself as to the consequences of entering into this Agreement.

## ARTICLE 20
## NO FORCE MAJEURE

20.1    Notwithstanding the occurrence of any event which might otherwise be construed as an event of force majeure, *vis major* or *casus fortuitus*, the Seller shall not be relieved of any of its obligations under this Agreement.

## ARTICLE 21
## GENERAL

21.1    **Entire Agreement**

This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and documents to be delivered hereunder and the Transaction Documents (other than an exception expressly set forth as such in the Transaction Documents), the statements in the body of this Agreement will have precedence.

21.2    **Waiver and Estoppel**

No addition to, variation or consensual cancellation of this Agreement shall be of any force or effect unless in writing and signed by or on behalf of both Parties.

No indulgence by either Party to the other, or failure strictly to enforce the terms hereof, shall be construed as a waiver or be capable of founding an estoppel.

21.3    **Further Assurances**

The Parties undertake at all times to do all such things, to perform all such acts and to take all such steps and to procure the doing of all such things, the performance of all such actions and the taking of all such steps as may be necessary for or incidental to the putting into effect or maintenance of the terms, conditions and import of this Agreement and the Transaction Documents.

21.4    **Severability**

If any provision of this Agreement shall at any time, for any reason, be declared invalid, void or otherwise inoperative by a court of competent jurisdiction, such declaration or decision shall not affect the validity of any other provision or provisions of this Agreement, or the validity of this Agreement as a whole and, to the fullest extent permitted by law, the other provisions hereof shall remain in full force and effect in such

jurisdiction and shall be liberally construed in favor of the Factor in order to carry out the intentions of the Parties hereto as nearly as may be possible. The invalidity and unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

21.5    **Non-Fiduciary Relationship**

The Seller acknowledges that there is no, and it will not seek or attempt to establish any, fiduciary relationship between the Factor and the Seller, and the Seller waives any right to assert, now or in the future, the existence or creation of any fiduciary relationship between the Factor and the Seller in any action or proceeding (whether by way of claim, counterclaim, crossclaim or otherwise) for damages.

21.6    **Financial Accommodation**

This Agreement shall be deemed to be one of financial accommodation and not assumable by any debtor, trustee or debtor-in-possession in any bankruptcy proceeding without the Factor's express written consent and may be suspended in the event a petition in bankruptcy is filed by or against the Seller.

21.7    **Specific Performance**

The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance.

21.8    **Counterparts**

This Agreement may be executed in counterparts, by original or facsimile signature, each of which when so executed and delivered shall be deemed an original and all of which shall together constitute one and the same instrument.

## ARTICLE 22
## SEGREGATED PORTFOLIO COMPANY, LIMITED RECOURSE AND NON-PETITION

22.1    Each of the parties hereto acknowledges that SPC2 is a Segregated Portfolio Company and that:

(a)    under the Companies Law:

(i)    the assets of a segregated portfolio of a Segregated Portfolio Company shall only be available and used to meet liabilities to the creditors of such Segregated Portfolio Company and holders of segregated portfolio shares who are creditors or holders of segregated portfolio shares in respect of such segregated portfolio and who shall thereby be entitled to have recourse to the Segregated Portfolio Assets attributable to such segregated portfolio for such purposes;

(ii)    the assets of a segregated portfolio of a Segregated Portfolio Company shall not be available or used to meet liabilities to, and shall be absolutely protected from, the creditors of such Segregated Portfolio Company and holders of segregated portfolio shares who are not creditors or holders of segregated portfolio shares in respect of such segregated portfolio, and who accordingly shall not be entitled to have recourse to the Segregated Portfolio Assets attributable to that segregated portfolio; and

(b)    where a Factor is liable to another party hereto under or in connection with this Agreement such liability shall extend only to, and such party shall, in respect of such liability, be entitled to have recourse only to the respective Segregated Portfolio Assets of the Portfolio with respect to such Factor, and such liability shall not extend to, and such party shall not have recourse with respect to such liability to the Segregated Portfolio Assets attributable to any other segregated portfolio of SPC 2 or to the general assets of SPC 2.

This Article 22.1 is without prejudice to Article 22.2.

22.3    The rights, liabilities and obligations of each Factor under this Agreement are deemed to be rights, liabilities and obligations of the Portfolio with respect to such Factor and not rights, liabilities and obligations of SPC 2 acting in its own name or on its own account or in the name of or for the account of any segregated portfolio of SPC 2 other than such Portfolio with respect to such Factor.

22.4    Each party hereto hereby irrevocably agrees that it shall not take any action to commence any case, proceedings, proposal or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganisation, restructuring, arrangement in the name of insolvency proceedings, adjustment, winding-up, liquidation, dissolution, composition or other relief (including, without limitation, any application for a receivership order) with respect to SPC 2, any Factor, Portfolio 1, Portfolio 2 or any other segregated portfolio of SPC2 or the debts or other liabilities of SPC 2, any Factor, Portfolio 1, Portfolio 2 or any segregated portfolio of SPC2 or otherwise seek the appointment of or taking possession by a receiver, liquidator (including provisional liquidator), restructuring officer, assignee, trustee, custodian, sequestrator, administrator, administrative receiver, conservator or other similar official of SPC2, any Factor, Portfolio 1, Portfolio 2 or any other segregated portfolio of SPC2 or the assets of any of them.

22.5    Save as otherwise provided for in this Agreement, the obligations of each Factor under this Agreement will not be obligations or responsibilities of, or guaranteed by, any other person or entity.

22.6    The obligations and liabilities of each Factor under or in connection with this Agreement are several and not joint.

22.7    The provisions of this Article 22 (*Segregated Portfolio Company, Limited Recourse And Non-Petition*) shall survive termination of this Agreement for any reason whatsoever.

*[signature pages follow]*

**IN WITNESS WHEREOF** the Parties hereto have caused this Agreement to be signed, sealed and delivered by their respective authorized signatories as of the date first written above.

**TESSPAY SERVICES, INC.**

Per:          **Jeff Mason**
                **CEO**

**TESSPAY FINANCE, INC.**

Per:          **Jeff Mason**
                **CEO**

*Factoring Agreement – signature pages*

**FACTOR**

For and on behalf of each Factor

**CHANNEL TRADE FINANCE 2 SPC ON BEHALF OF AND FOR THE ACCOUNT OF TF ARRAN2 SP**

Authorized Signature:

DocuSigned by:

4B0B8B594C9C45C...

Authorized
Signatory
Name :
Kirstie Krypner

Authorized
Signatory
Position:
Director

2

*Factoring Agreement – signature pages*

**CHANNEL TRADE FINANCE 2 SPC ON BEHALF OF AND
FOR THE ACCOUNT OF TF 2.1 SP**

Authorized Signature:

Authorized
Signatory
Name:
Kirstie Krypner

Authorized
Signatory
Position:
Director

3

*Factoring Agreement – signature pages*

**SCHEDULE A**
**FACTORING FEES**

The Factoring Fee is calculated as (applicable to a Currency and a Factor) the Factor Deposit Amount *multiplied by* the Annual Interest Rate *multiplied by* (the number of days in the Interest Period *divided by* 360);

From the date of this Agreement and including 31 August 2022;

| Currency | Annual Interest Rate | Interest Payment Frequency | Interest Period | Interest Payment Date |
|----------|---------------------|----------------------------|-----------------|-----------------------|
| EUR | 7.5% | Monthly | Calendar Month | 16th of each month, or as agreed in writing between and the applicable Factor. |
| USD | 7.5% | Monthly | Calendar Month | 16th of each month, or as agreed in writing between and the applicable Factor. |

From (and including) 1 September 2022 until the termination of this Agreement;

| Currency | Annual Interest Rate | Interest Payment Frequency | Interest Period | Interest Payment Date |
|----------|---------------------|----------------------------|-----------------|-----------------------|
| EUR | 3 Month EURIBOR + 7.5% | Quarterly | Calendar Quarter, from an Interest Payment Date to the next Interest Payment Date, with the first Interest Period being from 1 September 2022 to 1 October 2022 | 1st of October, January, April, and July (or the next Business Day) |
| USD | 3 Month Term SOFR + 6.07% | Quarterly | Calendar Quarter, from an Interest Payment Date to the next Interest Payment Date, with the first Interest Period being from 1 September 2022 to 1 October 2022 | 1st of October, January, April, and July (or the next Business Day) |

*Where;*

**"EURIBOR"** means the applicable Screen Rate as at the start of the Interest Period, subject to a floor of zero (0) per cent;

**"Screen Rate** means at or about 11.45 a.m. three (3) Target2 Business Days prior to each on each Interest Payment Date, the rate of interest for EUR deposits for the applicable Annual Interest Rate and the applicable Interest Period distributed electronically by Bloomberg, (or any replacement Bloomberg page or screen which displays that rate) or, if this page or screen ceases to be available, the applicable Factor will determine the rate of interest for EUR deposits for the applicable Annual Interest Rate and the applicable Interest Period distributed electronically by Reuters (or any replacement Thomson Reuters page or screen which displays that rate), or, if this page or screen ceases to be available, the applicable Factor will determine the rate of interest by interpolation of the rates of interest onscreen with the closest possible tenors to the applicable Interest Period displayed on the screens distributed by Bloomberg (or, if they are not available, by Thomson

27026256.2 C4585.156949

*Factoring Agreement – signature pages*

Reuters). If the agreed page is replaced or the service ceases to be available, the applicable Factor may specify another page or service displaying the appropriate rate.

**"Target2 Business Day"** means a day on which the Target2 system is in operation.

**"Term SOFR"** means the Term SOFR Reference Rate for a tenor comparable to the applicable quarter on the day (such day, the Periodic Term SOFR Determination Day) that is two Business Days prior to the first day of such quarter, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day, the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding Business Day is not more than three (3) U.S. Business Days prior to such Periodic Term SOFR Determination Day;

**"Term SOFR Administrator"** means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate as agreed by the parties to this Agreement);

**"Term SOFR Reference Rate"** means the forward-looking term rate based on SOFR, subject to a floor of zero (0) per cent.;

5